<u>NOT FOR PUBLICATION</u>

R E C E I V E D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SEP 0 9 2016

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

---

LAWRENCE VELCKO, JR.
607 W. Wilkes Barre Street
Easton, PA 18042

     *Plaintiff,*

v.

SAKER SHOPRITES, INC. d/b/a/
SHOPRITE BOUND BROOK
611 West Union Avenue
Bound Brook, NJ 08805

     *Defendant.*

Civil Action No.: 15-cv-1217 (PGS)(LHG)

<u>**MEMORANDUM**</u>
<u>**AND**</u>
<u>**ORDER**</u>

---

**SHERIDAN, District Judge.**

<u>**Facts**</u>:

     Lawrence Velcko ("Velcko" or "Plaintiff") was hired by Saker Shoprites, Inc. ("Saker")

on January 5, 2001. (Plaintiff's Statement of Facts, ("PSOF") ¶ 1). On October 21, 2004, Velcko

was transferred to Defendant's Board Brook location. (PSOF ¶ 2). He was a "night crew clerk"

performing work such as organizing and cleaning, using power jacks, transporting and stocking

products, disposing of wrapping and cardboard, and verifying certain equipment for operation.

(PSOF ¶ 3).

     Velcko has suffered from chronic and extreme conditions of Eczema, Cellulitis, MRSA,

psoriasis, skin disorders, and other similar conditions for about a decade. (PSOF ¶ 4). In 2011,

after experiencing issues related to his eczema, Velcko made use of medical leave pursuant to the Family and Medical Leave Act. (Defendant's Statement of Facts, ("DSOF") ¶ 25).

Plaintiff alleges that during the course of his employment he was subject to discrimination and ridicule on the basis of his health condition, including being called names and having other employees bet on when he would return to work. (DSOF ¶ 29).

The last time that Velcko physically worked at Saker was September 12, 2013 into the morning of September 13, 2013. September 14th was the first day that Velcko missed time from work due to his health conditions, and he had called out of work. He was seen by his physician on September 17, who noted that his eczema had worsened, and his physician provided a return to work date of September 18. He was seen again by his physician on September 20, who instructed Velcko to go to the hospital. (PSOF ¶ 18).

There is a dispute as to the details of the remainder of Plaintiff's missed time, the amount of contact Plaintiff actually had with Velcko, and as to what occurred during Plaintiff's meetings with physicians. Essentially, Defendant claims that between September 14, 2013 and October 13, 2014, Plaintiff kept in regular touch with Saker and provided Saker with notes and documents from his physician on four occasions. (DSOF ¶ 50). Then, after weeks without hearing from Plaintiff, Saker suspended Plaintiff's employment pending termination for job abandonment on October 28, 2013. (DSOF ¶ 70). Plaintiff was sent a letter indicated that he was terminated as of October 28, 2013, though witnesses have testified that this was a typographical error and that Plaintiff was only suspended pending termination. (DSOF ¶ 72). He was formally terminated on November 20, 2013 after meeting with Kevin Moroney, Senior Vice President of Human Resources and Labor Relations at Saker, and the United Food and Commercial Workers Union,

2

Local 1262 ("UFCW"). (Defendant's Response to Plaintiff's Statement of Facts, ("DRPSOF") ¶ 25).

Defendant claims that on September 24, 2013, because Plaintiff had been out of work for 7 or more days, he was automatically sent an Out of Work packet consisting of temporary disability paperwork and a Family Medical Leave Act ("FMLA") return to work medical certification form; these documents had to be completed and submitted in order for Plaintiff to receive job protected leave. (DSOF ¶ 54). Defendant claims that between October 2 and October 7, Alexis Summers ("Summers"), Saker's Benefits Manager, personally spoke with Plaintiff, and her notes indicate that she explained in detail the procedures for excusing absence based on disability. (PSOF ¶ 55). Saker provided employees with 52 weeks of unpaid leave, which was more than the 12 weeks of unpaid leave required by the Family and Medical Leave Act ("FMLA"). (DSOF ¶17). Defendant claims that Plaintiff did not return the necessary paperwork in time to receive this benefit. (DSOF ¶ 86).

Plaintiff contends that he was never provided with the appropriate FMLA forms and disputes that assertion that Summers apprised him of his rights and responsibilities for receiving benefits. (PSOF ¶¶ 54-55).

There are additional facts indicating that Plaintiff was reinstated to his job at a different New Jersey Saker location in January 2014. However, based on a course of events that is entirely in dispute, Plaintiff did not work at the new location, and was eventually terminated for good from Saker. The Court will not delve into this issue, since it is does not affect this motion.

Plaintiff filed a two count Complaint on February 16, 2015. In Count I, Plaintiff alleged violations of the New Jersey Law Against Discrimination ("NJLAD") for 1.) discrimination/hostile work environment, 2.) retaliation and 3.) failure to accommodate. In Count

3

II, Plaintiff alleged violations of the FMLA for 1.) interference and 2.) retaliation. Defendant brought this motion for summary judgment (ECF No. 18) on May 13, 2016. In its reply brief, Defendant withdrew its motion for summary judgment as to the NJLAD retaliation claims that relate to 2014. Plaintiff has also withdrawn its motion as to the FMLA retaliation claim. The remaining claims are discrimination/hostile work environment and failure to accommodate under the NJLAD, and interference under the FMLA. For the reasons stated below, Defendant's motion for summary judgment is granted in part and denied in part.

**Legal Standard**:

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *See Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson,* 477 U.S. at 248; *Siegel Transfer, Inc.*

4

*v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). Moreover, only disputes over

facts that might affect the outcome of the lawsuit under governing law will preclude the entry of

summary judgment. *See Anderson*, 477 U.S. at 247-48.

**Analysis**:

### I.    FMLA Interference Claim

For an FMLA interference claim, an employee must only show that 1.) he was entitled to

FMLA benefits and 2.) he was denied those benefits. *Thurston v. Cherry Hill Triplex*, 941 F.

Supp. 2d 520, 526 (D.N.J. 2008). It is unlawful for an employer to "interfere with, restrain, or

deny the exercise of" these rights. 29 U.S.C. § 2615(a)(1). The employee does not need to show

that he was treated less favorably than other employees, and the employer cannot justify its

actions by providing a legitimate business reason. *Thurston*, 941 F. Supp. at 526. The FMLA

provides eligible employees with 12 weeks of leave in a one-year period following certain

events, including a serious medical condition. 29 U.S.C. § 2612(a)(1).

To prevail on an FMLA interference claim, Plaintiff must establish that: "(1) [Velcko]

was entitled to FMLA benefits; (2) [Saker] violated § 2615 by 'interfering with, restraining, or

denying [him] exercise of FMLA rights;' and (3) [Velcko] was prejudiced by the interference."

*Sconfienza v. Verizon Pennslyvania, Inc.*, 307 Fed. App'x 619, 621 (3d Cir. 2008) (citing

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). The Third Circuit explains that

there are notice requirements:

> [T]he DOL's regulations impose upon the employer obligations to
> communicate with employees regarding their rights under the
> FMLA. In particular, the regulations require employers to provide
> employees with individualized notice of their FMLA rights and
> obligations. Pursuant to 29 C.F.R. § 825.208(a), "[i]n all
> circumstances, it is the employer's responsibility to designate
> leave, paid or unpaid, as FMLA-qualifying, and to give notice of
> the designation to the employee...." If an employer provides

> employees with a handbook concerning employee benefits, "the handbook must incorporate information on FMLA rights and responsibilities and the employer's policies regarding the FMLA." 29 C.F.R. § 825.301(a)(1). If the employer does not provide such a handbook, such information must be provided when an employee requests leave. 29 C.F.R. § 825.301(a)(2). Moreover, each time the employee requests leave, the employer must, within a reasonable time thereafter—"one or two business days if feasible," "provide the employee with written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." 29 C.F.R. § 825.301(b)(1) , (c). This specific notice must include, among other things, whether "the leave will be counted against the employee's annual FMLA leave entitlement," 29 C.F.R. § 825.301(b)(1)(i) , and "the employee's right to restoration to the same or equivalent job upon return from leave," 29 C.F.R. § 825.301(b)(1)(vii).

*Conoshenti v. Public Service Electric and Gas Co.*, 364 F.3d 135, 142 (3d Cir. 2004).

Defendant argues that summary judgment should be granted because any prejudice that Plaintiff suffered was his own fault for not timely submitted paperwork that would have provided him with 52 weeks of leave, longer than the 12 weeks offered by the FMLA. Defendant explains that under the FMLA, damages are only available for loss of "any wages, salary, employment benefits, or other compensation denied or lost to such employee *by reason of* the violation." 29 U.S.C. § 2617(A)(i)(I) (emphasis added). Defendant claims that, because of this "by reason of" language, an employee must show that the FMLA violation was the proximate cause of his damages. *See Breedon v. Novartis Pharms.* Corp., 714 F. Supp. 2d 33, 35-36 (D.D.C. 2010); *affirmed Breedon v. Novartis Pharms. Corp.*, 646 F. 3d 43, 49 (D.C. Cir. 2011).

Defendant asserts that Saker's alleged failure to provide him specifically designated FMLA paperwork is not the proximate cause of Plaintiff's damages. Saker's benefit manager, Summers, testified that on September 24, 2013, because plaintiff had been out of work for 7 days or more, Plaintiff was automatically sent an "out of work" packet consisting of temporary disability paperwork and an FMLA return to work medical certification form. (DSOF ¶ 54).

6

Plaintiff previously admitted receipt of this "out of work packet" form, and the evidence indicates that it was timely received by Plaintiff. (DSOF ¶¶ 18-19, 71, 84-89). If Plaintiff timely completed this packet, he would have been able to receive the 52 week union leave benefit. (DSOF ¶ 18, 54-55, 71). Plaintiff previously admitted to having received the "out of work" packet, discussed it with Summers, and had his physician fax in portions of the completed paperwork on October 2, 2013, according to Defendant. (DSOF ¶¶ 18-19, 55-58, 71). Plaintiff did submit all of the required paperwork by November 29, 2013, but this was after termination had been finalized. (DSOF ¶ 84). This paperwork was dated October 2, 2013, suggesting that Plaintiff completed this earlier but had failed to submit it to Saker, according to Defendant. (PSOF ¶¶ 85-86).

In support of Defendant's argument, Summers testified that there is not really any difference between the medical certification form from the disability paperwork she had sent him and the medical certification form from FMLA paperwork. Summers Dep., 113: 7-17.

However, Plaintiff disputes most of these facts. In Summers' deposition, it was asked: "So you are saying in 2013 you did not send a certification of health care provider form to Mr. Velcko for 2013?" She said she did not. The next question was: "You only sent the short term disability health care provider information?" She said that was "correct." Moreover, Summers could not recall whether she sent Velcko "any type of Family Medical Leave Act information in 2013." Summers Dep. 27: 6-18. The packet that she sent did not include the FMLA form, she said. Summers Dep. 68: 7-12. In her deposition, Summers agreed that the "short term disability…papers don't inform Mr. Velcko of his FMLA rights…" Summers Dep. 82:21-83:2. When Summers spoke on the phone with Velcko, she did not recall advising him of his FMLA rights; she only requested that he complete the medical certification to excuse his absence.

89:21-90:7. Finally, Summers admitted that she did not "actually inform Mr. Velcko of his FMLA rights in September or October of 2013." 115:5-8. She said that it was "perhaps an oversight" that Saker did not notify him of his FMLA leave rights. Summers Dep. 114:20-115:4. Similarly, Moroney, the VP of HR, testified that nobody had sent Velcko any type of FMLA paperwork around this time. Maroney Dep. 37:7-10; 99:3-6.

The Court finds that there are material issues in dispute as to whether Plaintiff received adequate notice that these disability forms would result in his FMLA benefits. In its Statement of Facts, Defendant asserts that "In order to obtain this 12 month/52 week unpaid leave, an employee need only complete the temporary disability paperwork with medical certification ("Out of Work packet") provided to employees. (DSOF ¶ 18). Moreover, "This Out of Work packet is automatically sent to employees who have been absent for 7 straight days..." (DSOF ¶ 19). Defendants have not explained why an employee would be aware that submitting the information from the Out of Work packet would afford such leave. It is undisputed that Plaintiff confirmed receipt of the Saker Employee Manual. (DSOF ¶ 13). It is also undisputed that the manual devotes six pages to the FMLA and states that an employee may receive these benefits. (DSOF ¶ 15).

First, an employee handbook "can only satisfy the FMLA's *general* notice requirements." *Lupyan v. Corinthian Colleges, Inc.*, 761 F. 3d 314, 319 (3d Cir. 2014). Second, the Out of Work packet says that "an employee must request a family leave from the Company using the form provided." Ex. 10 to Burd Cert., at 29. But this form is not included in the exhibit or certification, so the Court cannot tell whether it is the same form sent to Plaintiff. Defendant's Statement of Facts also claims that "all of the information required within Saker's FMLA paperwork is essentially the same as the information required within the Out of Work packet." (DSOF ¶ 22).

8

But this is not evident by comparing the forms. The Out of Work Packet, provided to the Court, requires Plaintiff to fill out information related to his disability, but it does not explain what his rights are. See Ex. 12 to Burt Cert. In contrast, the FMLA paperwork explains Plaintiff's rights and responsibilities. Ex. 13 to Burt Cert. The information provided to Plaintiff may not have been sufficient to apprise him of his rights under the FMLA.

Defendant also asserts that if Plaintiff had requested and received his FMLA leave, he would still have been subject to termination since his leave would have been exhausted before he was eligible to return to work. According to the Department of Labor regulations, "If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition or an injury or illness also covered by workers' compensation, the employee has no right to restoration to another position under the FMLA." 29 CFR §825.216(c); see also *Colbeburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 332 (1st Cir. 2005).

Here, Plaintiff was absent 100 days in less than 10 months. (DSOF ¶¶ 121-126). This exceeds the 12 weeks (84 days) provided by FMLA leave. Defendant claims that the doctor's note, which he provided to Saker on January 28, 2014 that cleared him to return to work on November 22, 2013 (an absence of only 79 days), was not created until December 13, 2013, so Plaintiff could not have returned to work prior to that date. (DSOF ¶¶ 97-98). Defendant substantiates this statement by providing a doctor's note saying that Velcko was seen on November 6, 2013, and that from September 14 through November 21 he was under this doctor's care and unable to perform his work. The note, dated December 13, 2013, says he that Velcko improved and may return to work. Ex. 21 to Burd Cert. However, in his deposition, Dr. Keller said he had not seen Plaintiff since November 6, Burd. Cert., Ex. 23; Keller Dep., 30:6-20. But

this seems to contradict with the Defendant claims that backdated fitness-for-duty certifications are insufficient under FMLA regulations. *Burkett v. Bealieu Group, LLC*, 382 F. Supp. 2d 1376 (N.D. Ga. 2005). Moreover, according to Defendant, several witnesses testified that Plaintiff was told to bring medical documentation with him to the Union/Shaker meetings on November 26, 2013, but he did not do so. (PSOF ¶¶ 78-83).

However, a different note was electronically signed by Dr. Keller on November 6, 2013. It says that he saw Velcko in his office that day, and he provided a return to work date of November 21, 2013. Ex. Y to Plaintiff's motion. If anything, Dr. Keller's testimony compared with his notes presents a question of material fact on whether Velcko would be subject to termination even if he had received proper FMLA leave. It is not clear exactly when Velcko could return to work.

For these reasons, Defendant's motion for summary judgment on the FMLA claim is DENIED.

## II.    NJLAD-discrimination/hostile work environment

Defendant also seeks summary judgment on Plaintiff's NJLAD claims for discrimination/hostile work environment, failure to accommodate, and retaliation. To make out a claim for hostile work environment, a plaintiff must establish that the conduct "(1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive." *Shepherd v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 24. The court should base its analysis on the "reasonable person" standard, and not rely on plaintiff's "subjective response" to the harassment or the defendant's "subjective intent." *Cutler v. Dorn*, 196 N.J. 419, 431 (2008).

10

New Jersey courts have held that "[a] hostile work environment discrimination claim cannot be established by epithets or comments which are 'merely offensive.'" *Heitzman v. Monmouth County*, 321 N.J. Super. 133, 147 (App. Div. 1999). The NJLAD is "not intended to be a 'general civility code' for conduct in the workplace ... Discourtesy or rudeness should not be confused with...harassment. Thus, 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions' on employment." *Id*; see also *Grubb v. Garbutt*, 2010 WL 3516857, at *6 (N.J. App. Div. Sept. 3, 2010); *Herman v. Coastal Corp.*, 348 N.J. Super. 1, 21 (App. Div.), *cert. denied*, 174 N.J. 363 363 (2002).

Plaintiff claims that he was ridiculed because of his health condition, being called names and having other employees bet on when he would return to work. Velcko was directed each night by Eric Boston (night crew chief), who was overseen by William Perry (grocery manager). The highest person in charge of Plaintiff's location at nights was Thomas Chamra, Assistant Store Manager, who oversaw Velcko, Boston, and Perry. Rachel Hollander was Velcko's in-store HR manager. The overall store manager responsible for everyone was James Boles. (PSOF ¶ 11). Plaintiff claims that he was subject to discriminatory comments, which started to occur multiple times per week in 2013. (PSOF ¶ 12). He claims that Boston repeatedly called him "Family Leave Larry" in front other employees, would tell new employees to ask Family Leave Larry for the time off rules, and joked about betting when Velcko would call out sick, among other similar comments. These comments allegedly occurred two or three times a week in 2013. Perry allegedly made two discriminatory remarks to Velcko about Plaintiff always being sick, humiliated Velcko in front of others and told him at one point in 2013 to look whose back, and asked how long would he be out this time. Hollander allegedly refused to shake Velcko's hand in

May 2013 by pulling away, and saying not to touch her, because she was afraid of catching what he had. (PSOF ¶ 13).

Plaintiff says that he complained in February 2013 about Boston's comments and again in the summer of 2013 about discriminatory comments from Boston and Perry. (PSOF ¶ 14). Velcko allegedly complained to Boston, to Lynn Fine (Defendant's Bookkeeper), Joe Adamack, (Defendant's Inventor Manager), Chamra, Hollander, and Allen Karpf (another manager). Velcko allegedly expressed concerns about Perry and Boston's comments to Chamra on at least six occasions between February and the Summer of 2013. (PSOF ¶ 15). Boston allegedly continued to make discriminatory comments until Velcko was terminated. (PSOF ¶ 16).

Defendant contends that no witness has corroborated any of these claims. (DSOF ¶ 30). Defendant explains that Saker's Employee Manual requires that an employee "who feels discriminated against should report such incidents to their supervisor or Human Resources." (DSOF ¶ 31). Defendant claims that Plaintiff never made such claims about reporting discriminatory comments by Boston to the Equal Opportunity Commission ("EEOC") when he filed a claim there shortly after his termination. (DSOF ¶ 33). In the EEOC action, Plaintiff claimed that he only reported one incident involving discrimination—he reported this incident, involving his supervisor Perry, to Lynn Fine, Joe Admak, and Alan Karpf. (DSOF ¶ 38). Also, when asked about his treatment by Chamra, Plaintiff said at his deposition that Chamra's treatment of him had been "fair." (DSOF ¶ 34). Chamra denied that Plaintiff ever complained to him about disparaging or discriminatory comments. (DSOF ¶ 35). Plaintiff also said at deposition that Boston's discriminatory comments began in 2011, but his EEOC complaint alleges that these comments did not begin until 2013. (DSOF ¶ 36). Plaintiff admitted at his deposition that he waited two years before raising complaints about comments made by his co-

workers, and he never followed up or bothered to contact human resources after allegedly complaining to Karpf. (DSOF ¶¶ 37, 39). Plaintiff alleges that Perry called him a "liar," was hostile, degrading and complained that Plaintiff was always sick. (DSOF ¶ 42). While Perry confirmed that he called Plaintiff a liar, he denied having made derogatory documents toward Plaintiff or discriminating against him. (DSOF ¶ 44). Furthermore, in his deposition, Plaintiff said that he liked being at the Bound Brook store. (DSOF ¶ 103). He also failed to report harassment or discrimination during any of the three meetings with Saker and the UFCW. (DSOF ¶ 104).

Although Plaintiff disputes the accuracy of some of these statements, the Court finds that Plaintiff's allegations do not rise to the level of a hostile work environment claim. It cannot be said that the comments made by the other Saker employees were severe or pervasive enough for a reasonable person to believe that they caused a change in the terms and conditions of employment. *See Lehmann v. Toys R. Us., Inc.* 132 N.J. 587, 612 (1993). Despite the comments, Plaintiff admits that he wanted to return to the Bound Brook location. (DSOF ¶ 103). Even though Chamra did not do anything to address Plaintiff's complaints to him, Plaintiff said that Chamra treated him "fairly." (DSOF ¶ 34). Plaintiff also admits that he never contacted human resources about his concerns. (DSOF ¶ 39). While Plaintiff claims that he testified that he specifically complained to Hollander, the highest manager of HR in Velcko's location, he later retracted this statement. (See Plaintiff's Ex. MM, Velcko Dep., 95:22-96:4). For these reasons, Defendant's motion for summary judgment is granted on the hostile work environment claim.

### III.   NJLAD: failure to accommodate

Defendant also argues that Plaintiff cannot meet the elements of a failure to accommodate claim. Under the NJLAD, Plaintiff must show that "(1) [he] was disabled and [his]

13

employer knew it; (2) [he] requested an accommodation or assistance; (3) [his] employer did not make a good faith effort to assist; and (4) [he] could have been reasonably accommodated. *Bertoletti v. AutoZone, Inc.*, 132 F. Supp. 3d 590, 601-02 (D.N.J. 2015) citing *Armstrong v. Burdette Tomlin Mem. Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006).

When an employee asks for an accommodation, the employer must "engage the employee in the interactive process of finding accommodations." *Armstrong*, 438 F.3d at 246. "If an 'employee could have been reasonably accommodated but for the employer's lack of good faith,' the employee will win on his failure to accommodate claim." *Id.* "Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome." *Id.* Any request that makes clear to the *603 employer that the employee seeks an accommodation is sufficient to trigger the employer's obligation to engage in the interactive process. *Bertolotti*, 132 F. Supp. 3d at 602-03.

First, Defendant claims that Plaintiff never made a request for an accommodation. Second, Defendant asserts that there is sufficient evidence to establish that Velcko was provided an accommodation. According to Defendant, Velcko received the paperwork to obtain 52 weeks of unpaid leave, he admitted to having the paperwork, he discussed the paperwork with Ms. Summers, and his physician faxed portions of the completed paperwork on October 2, 2013. (DSOF 18-19, 55-58, 71, 84-86).

In opposition, Plaintiff argues that Velcko was denied federally protected leave under the FMLA, meaning he was denied a reasonable accommodation. Management was aware of

14

Velcko's ongoing health problems. Human resources admitted knowing that ADA requires accommodations of medical time off from work. Maroney Dep. 26: 5-8; Summers Dep. 35:19-22. Maroney testified that he would not proactively meet with Velcko to discuss accommodation for a company that has 8,000 employees. Maroney Dep. 132:6-18.

As stated in the FMLA leave section, it appears that there are several material issues of facts on the issue. As Plaintiff notes, courts have considered certain leaves of absence to be a reasonable accommodation. "[T]he federal courts that have permitted a leave of absence as a reasonable accommodation…have reasoned…that applying such a reasonable accommodation at the present time would enable the employee to perform his essential job functions in the near future." *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004). At this point, the details are still nebulous about what occurred between September and November of 2013. Defendant claims that the company provided documents that, if Velcko signed, would have provided him with a more generous leave of absence. However, it appears that Velcko may never have been aware of the implications of the forms in his possession. Further, Maroney testified that he was not going to meet with Plaintiff to discuss accommodation needs when he had to oversee 8,000 employees. The Court cannot say for certain that there was an appropriate interactive process, and will deny summary judgment on this issue.

**IV.   NJLAD—retaliation**

Defendant also seeks summary judgment on Plaintiff's NJLAD retaliation claim. To establish a prima facie retaliation claim under the NJLAD, a plaintiff must establish that "(1) that [he] engaged in a protected activity; (2) that [he] suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action." *Davis v. City of Newark*, 417 F. App'x 201, 202 (3d Cir. 2011). Once a prima facie case

15

for retaliation is established, the burden of production shifts to the employer to articulate a legitimate reason for the adverse employment action. *Gaines v. United Parcel Service, Inc.* 2014 WL 1450113, at \*4 (D.N.J. Apr. 14, 2014). "Plaintiff must then show that a retaliatory intent, not the proffered reason, motivated defendant's actions." *Id.* (internal citations omitted). In addition, a plaintiff can only recover where a complaint was made with a "good faith belief that the conduct complained of violates the NJLAD." *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 549, 70 A.3d 602, 620 (2013).

Defendant claims that Plaintiff cannot meet the prima facie burden because there is no evidence establishing a causal link between Plaintiff's complaints and any adverse employment action. Plaintiff purportedly engaged in a protected activity by making verbal complaints to his supervisor, Chamra, and by sending a written statement to Alan Karpf. In response, he claims that he was preliminarily suspended/terminated. Defendant claims that there is no evidence that Chamra or Karpf played any role in the acts of retaliation, because neither had any authority to take these adverse employment actions. (DSOF ¶¶ 70, 4, 12). These decisions are always made at the corporate level, according to Defendant, and there is no evidence that Plaintiff complained to corporate HR. (DSOF ¶¶ 4, 12).

Even if Plaintiff could make out a prima facie case, Velcko cannot establish that the adverse action was a pretext, according to Defendant. This is because Plaintiff did not communicate with Saker for weeks before learning of his suspension pending termination, in violation of the Saker policy to personally keep the Store Manager on duty informed if absent for more than one day, and keep him apprised of the expected date of return. (DSOF ¶ 63). Plaintiff admitted that he was aware of this policy, and he followed this policy during his first month of absence. (DSOF ¶¶ 65, 50-56). The last doctor's note said that Plaintiff would be cleared to

16

return to work on October 13, 2013. (SOF 56). However, Plaintiff failed to return to work on that date and failed to advise his union representative of his status through November 6, 2013, the date Plaintiff learned of his suspension pending termination, according to Defendant. (DSOF ¶¶ 59, 73).

Plaintiff asserts that that Saker's policy was not actually implemented. Velcko allegedly never had to call in when on medical leave in 2011 or when hospitalized in other situations. Velcko Cert. ¶ 3, Ex. KK to Plaintiff's Opposition Motion; Summers Dep. 29:4-11; Hollander Dep. 26: 6-13; 32: 12-23; 33: 1-2. There appears to be a material question as to whether Defendant had an informal policy of allowing employees to submit their physician's notes upon returning to work. There also appears to be a material question as to whether Plaintiff spoke to the night manager on October 14, 2013 to say he was being admitted to the hospital and was not sure when he would be able to return. If this is true, a reasonable jury could find that Plaintiff did properly notify Saker, and that Saker's reason for terminating Plaintiff was pretextual. Therefore, Plaintiff's motion for summary judgment as to the retaliation claim is denied.

## V.    Liquidated damages

Finally, Defendant seeks dismissal of Plaintiff's request for liquidated damages. The FMLA allows for liquidated damages for violations equal to wages, salary, employment benefits or other compensation denied or lost to such employee because of the violation. 29 U.S.C. 2617(a)(1)(A)(iii). The FMLA provides that these damages will not be awarded if the violation was in good faith and that the employer had objectively reasonable grounds to believe that the act or omission did not violate the FMLA. *Id.*

Defendant contends that Plaintiff was provided documentation that would have allowed him to receive 52 weeks of unpaid leave; if anything, Velcko was simply not provided the

specific FMLA forms. If Plaintiff timely submitted these forms he would have obtained a more generous leave than the FMLA provides, so any violation was in good faith.

As it has already determined that there are triable issues of material fact here, the Court denies liquidated damages at this point.

## ORDER

For the reasons stated herein and for good cause shown,

IT IS on this 31st day of August, 2016, hereby

**ORDERED** that Defendant's Motion for Summary Judgment [ECF No. 18] is GRANTED IN PART and DENIED IN PART as follows:

Defendant's motion for summary judgment is GRANTED on the NJLAD hostile work environment claim, and that claim is dismissed; and

Defendant's motion for summary judgment is DENIED as to all other claims.

PETER G. SHERIDAN, U.S.D.J.